UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANGELO IAFRATE, JR., as Personal
Representative of the ESTATE OF
ANGELO IAFRATE, SR.; DOMINIC          Case No. 18-cv-12028
IAFRATE; and ANGELO IAFRATE,
SR. as Trustee of the JOHN IAFRATE    Paul D. Borman
IRREVOCABLE TRUST u/a/d 1/1/1988,     United States District Judge

                    Plaintiffs,

v.

WARNER NORCROSS & JUDD, LLP,

                    Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT WARNER NORCROSS & JUDD, LLP'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 88)

This is a legal malpractice case in which Plaintiffs Angelo Iafrate, Jr., as

Personal Representative of the Estate of Angelo Iafrate, Sr., Dominic Iafrate, and

Angelo Iafrate, Sr. as Trustee of the John Iafrate Irrevocable Trust,[1] complain that

---

[1] Angelo Iafrate, Sr. died in late 2019, after this case had been filed, and Angelo Iafrate, Jr. substituted into this case solely as personal representative for Angelo Iafrate, Sr.'s Estate. (See ECF No. 77, Second Amended Compl. ¶ 2.) John Iafrate's shares in the company, Angelo Iafrate Construction Company (AICC), were transferred into the John Iafrate Trust for his benefit in 1988, and Angelo Iafrate, Sr. served as Trustee. Upon Angelo Iafrate, Sr.'s death, Angelo Iafrate, Jr. and Mike

1

Defendant Warner, Norcross & Judd, LLP (WNJ), through WNJ attorney Justin Stemple, furnished improper legal advice to them during the formation of an Employee Stock Ownership Plan (ESOP) and thereafter subsequent matters. Plaintiffs assert claims against WNJ for (1) professional liability and professional negligence; (2) breach of fiduciary duty; (3) fraudulent misrepresentation; and (4) fraudulent concealment.

Now before the Court is Defendant WNJ's Motion for Summary Judgment (ECF No. 88) seeking dismissal of all of Plaintiffs' claims. WNJ argues that: (1) there is no genuine issue of material fact that Plaintiffs lack an attorney-client relationship with WNJ; (2) Plaintiffs' legal malpractice and breach of fiduciary duty claims are barred by the statute of limitations; (3) Plaintiffs' fraud claims are barred by the doctrines of res judicata and collateral estoppel; (4) Plaintiffs cannot establish the requisite proximate cause element of their legal malpractice claim; (5) Plaintiffs' fraud claims fail as a matter of law; and (6) Plaintiffs' breach of fiduciary duty claim fails. Defendant WNJ's motion for summary judgment has been fully briefed. The Court held a hearing on WNJ's motion on June 21, 2023, at which counsel for Plaintiffs and Defendant appeared.

---

Stefani became co-Trustees of the John Trust. (ECF No. 88-4, John Iafrate Dep., pp. 10-13, PageID.1938-41.)

For the reasons that follow, the Court GRANTS Defendant WNJ's Motion for Summary Judgment (ECF No. 88).

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Background

#### 1.      Angelo Iafrate Construction Company (AICC)

In 1969, Angelo Iafrate, Sr. (Angelo Sr.) established the Angelo Iafrate Construction Company (AICC), a road-building construction company serving metro-Detroit. Angelo Sr., along with his three sons – Dominic Iafrate, Angelo E. Iafrate (Angelo Jr.), and John Iafrate, all of whom had worked for the business at different times – owned all the outstanding shares of the Company.

Around the year 2000, Angelo Sr., Dominic, and John moved to Florida, and Angelo Jr. remained in Michigan to run AICC. In 2002, Angelo Jr. became AICC's CEO and President, and Robert Adcock (Adcock) became its Executive Vice President.

#### 2.      Formation of the Employee Stock Ownership Plan (ESOP) and Angelo Iafrate Inc. (AII)

In 2011, the Iafrate family members began to discuss the possibility of selling AICC. After consulting with AICC's CPA, Bill Kingsley, and Michael Stefani, who

3

was AICC's corporate counsel and the family attorney, the family decided to sell AICC to the Company's employees via an Employee Stock Ownership Plan (ESOP).

Plaintiffs allege that they (and AICC) formed a relationship with attorney Justin Stemple, a partner of the Defendant WNJ law firm, in February 2013 to explore the possibility of forming an ESOP.  In March 2013, AICC established an ESOP Exploratory Committee, of which Angelo Jr., then President of AICC, and Robert Adcock, then Executive Vice President of AICC, were members. (ECF No. 88-6, Stefani Dep. at p. 20, PageID.2242.) (ECF No. 88-9, Angelo Jr. Dep. at pp. 569-70, 719-20, PageID.3188-89, 3387-88.)

In July 2013, the ESOP Exploratory Committee members were given a presentation by Stout Risius Ross, LLC, a corporate financial advisory firm, which Stemple attended, outlining (1) the terms on which the ESOP would purchase the family member's stock in AICC, (2) the proposed fair market value price, and (3) the risks involved with seller-financing of an ESOP transaction. The presentation also provided information regarding an internal rate of return and the issuance of warrants as additional seller compensation. (ECF No. 88-16, Stemple Dep. at pp. 63-65, PageID.4171-72) (See ECF No. 88-12, Stemple 7/12/2013 email, PageID.3849-50 (referring to WNJ as "counsel to the company" and discussing "SRR's presentation last week" on the ESOP transaction).) Stemple testified that Angelo Jr.

4

attended the meeting "as both the president of AICC and as an individual. He was a shareholder there on behalf of the family. No other family members were present." (ECF No. 88-16, Stemple Dep. at p. 65, PageID.4173.)

Ultimately, the Iafrate family members agreed to a plan wherein they would finance 100% of the purchase price of the Company at below-bank/market interest rates, with the loan being secured by a stock pledge. The purchase price was set at $36.7 million. A new holding company known as Angelo Iafrate, Inc. (AII) was formed, by attorney Stefani, to which the Iafrate family contributed all of their AICC stock in exchange for 30,000 AII shares. AII then formed an ESOP which purchased all 30,000 of the Family Members' shares for $36.7 million.

At the December 6, 2013, closing of the ESOP transaction, AII delivered Senior and Junior Promissory Notes, drafted by Stemple, to each Family Member – Angelo Sr., Angelo Jr., Dominic, and the John Trust. The Notes totaled the full $36.7 million purchase price and provided for quarterly interest payments over ten years. (*See, e.g.,* ECF No. 88-5, Senior and Junior Notes issued to Dominic, PageID.2098-2101, 2110-13.) Section 1.3 of each Senior and Junior Promissory Note contained mandatory prepayment provisions if AII had excess funds, and Section 1.4 allowed for discretionary prepayment of "all or part of the principal of this Note at any time." (*See id.*) These prepayment provisions authorized only pro rata payments to the

5

Family Members. (*See id.* ("Any prepayment made under this Section shall be applied pro rata to the Sellers' [Senior/Junior] Notes based on the remaining principal balance of each note.").)

At the December 6, 2013 ESOP closing, AII also issued Common Stock Warrants, again drafted by Stemple, to each Family Member for 7500 total shares of stock, with each Family Member being issued the following number of shares: 1,687.5 shares to Angelo Sr.; 2,475 shares, Angelo Jr.; 2,475 shares to Dominic; and 862.5 shares to the John Trust. These Warrants entitled each Warrant Holder the option to either: (1) purchase shares from the Company at the $225.00 Exercise Price per share; or, (2) redeem shares for cash payment in the amount of the share price in effect as of such date ("Strike Price") less the Exercise Price. (*See, e.g.,* ECF No. 88-5, Common Stock Warrant issued to Dominic, PageID.2179-85.) The Warrants contained the following "Warrant Term" provision:

> 3. **<u>Warrant Term</u>**. This Warrant shall terminate on, and may no longer be exercised on or after, the date that is 60 days after the date that the Company has paid in full both the Senior Promissory Note and Junior Promissory [Note] issued by the Company in favor of the Holder.

(*Id.* PageID.2180.)[2]

---

[2] An earlier draft version of the Warrant had provided a different Warrant Term: "This Warrant shall specifically terminate on [December 21, 2024]." (ECF No. 89-16, Warrant Draft, PageID.5325 (brackets in original).) Stemple testified that he

The Iafrate Family Members also entered into an Intercreditor Agreement between themselves, dated December 6, 2013. (ECF No. 88-5, Intercreditor Agreement, PageID.2153-60.) While it was Stefani who initially suggested a need for this type of agreement, the actual Intercreditor Agreement was drafted by Stemple for the Family Members and it provided that the Family Member's security interests would have equal priority and would be equally enforced for their pro rata benefit. (*Id.*) (ECF No. 88-6, Stefani Dep. at pp. 128-29, PageID.2350-51.) Specifically, the Intercreditor Agreement provided:

> 4. <u>Application of Payments and Collateral</u>. In the event a Creditor receives any payment on the Creditor Indebtedness, or any payment or distribution from any of the Collateral, in each case prior to the time all of the Creditor Indebtedness shall have been fully paid, that Creditor shall receive and hold the same in trust for the benefit of all Creditors and shall forthwith apply the same Pro Rata against the Creditor Indebtedness.

(ECF No. 88-5, Intercreditor Agreement, PageID.2156.)

Thus, the Promissory Notes, the Warrants, and all the ESOP transactional documents, including the Intercreditor Agreement, were prepared by Defendant WNJ partner Stemple, Chair of the firm's Employee Benefits practice section.

---

does not remember who asked for the language to change to a Warrant Term of 60 days, but asserts that he would not have made that change on his own initiative. (ECF No. 88-16, Stemple Dep. at pp. 135-36, PageID.4243-44.)

After the ESOP transaction closed on December 6, 2013, Adcock became the President of AICC and co-Trustee of the ESOP, along with the two other Trustees, Hal Howlett and Greg Cooper; and Dominic, Angelo Jr., and Stefani were appointed to the Company's Board of Directors. (ECF No. 88-10, Adcock Dep. at pp. 25, 35-36, PageID.3696, 3706-07.) Angelo Jr. resigned from the Board of Directors in January 2016. (ECF No. 88-9, Angelo Jr. Dep. at pp. 526-27, PageID.3145-46.) Dominic and Stefani, however, remained on the AICC board at that time, and Robert Tinstman was appointed to fill the vacancy left by Angelo Jr.'s departure. (ECF No. 88-10, Adcock Dep. at pp. 119-20, PageID.3790-91.)

### 3.     Payments to Family Members

In March 2016, Adcock announced that he had sought permission from a bonding company to make a substantial payment in accordance with the Promissory Notes, but the bonding company had denied the request. (ECF No. 89-22, Minutes of AICC Board Meeting, 3/25/16, PageID.5354.) After that discussion, Angelo Jr. advised Adcock in a March 25, 2016 email:

> [I]f you eventually do any prepayment now or more down the line, I request only one thing. *I want 100% of any prepayment amounts only to the extent of my pro-rata prepayment allocation (I only speak for myself and only my note and no other family member on this directive) to be paid to my Dad exclusively in lieu of me.* If any waiver or some other kind of documentation is needed to reflect that directive, please send that paperwork to me direct.

(ECF No. 89-21, Email, PageID.5349-50 (emphasis added).) Dominic Iafrate and the John Trust also subsequently agreed to have their share of any prepayment go first to their father, Angelo Sr., as well. (ECF No. 88-6, Stefani Dep. at p. 50, PageID.2272.) (ECF No. 88-17, November 22, 2016 Meeting Minutes, PageID.4375 ("Mr. Adcock said that Angelo E. Iafrate [Jr.], the John Iafrate Trust and Dominic Iafrate had agreed that any prepayment on the junior and senior notes should be applied first to pay the notes to Angelo Iafrate Sr.").) No amendment or waiver of the Promissory Notes or any other documents was drafted or executed based on this newly proposed non-pro rata payment schedule.

In November 2016, Adcock obtained approval for a $5.4 million prepayment on Angelo Sr.'s Notes. (ECF No. 89-23, Kinsgley (UHY) 11/17/2016 Email to Stemple, PageID.5360.) The parties agree that on December 20, 2016, AII made a $5.4 million pre-payment, in full, directly to Angelo Sr. on his Senior and Junior Promissory Notes. Defendants state that this pre-payment was held in trust by Angelo Sr. for all of the Family Members under the terms of the Intercreditor Agreement.

Around that time, Adcock sent an email to Stemple stating that he had paid Angelo Sr.'s Notes in full and inquiring about how to handle/execute the Warrant.

(ECF No. 88-10, Adcock Dep. at p. 51, PageID.3722.) Stemple responded by referring Adcock to the forms included in the closing binder required to be submitted to execute the Warrants, and he explained to Adcock that if the paperwork is not submitted by each individual Holder within 60 days, the Warrants expire and the Company has no obligation to pay them. (*Id.*) (ECF No. 89-20, Emails, PageID.5346-47.)

The parties agree that on February 17, 2017, AII made additional prepayments, in full, on the Promissory Notes of Dominic Iafrate and the John Trust – $9.7 million to Dominic Iafrate and $3.3 million to the John Trust – which monies were held in trust for the Family Members under the Intercreditor Agreement. At this same time, Dominic and Stefani resigned from the Company's board of directors. (ECF No. 89-25, Acknowledgement and Resignation of Dominic, PageID.5365-66.) (ECF No. 88-6, Stefani Dep. at pp. 227-29, PageID.2479-81.)

Approximately one year later, on February 2, 2018, Adcock directed the payment of $8.9 million to Angelo Jr. for the full amount owed on his Promissory Notes. At this point, the entire indebtedness evidenced by the Promissory Notes, plus interest, was paid in full.

In February and March of 2018, all the Family Members, believing that the final February 2, 2018, payment to Angelo Jr. was the triggering event for all four

Warrants, attempted to exercise their Warrants for cash, through their attorney, Stefani. (ECF No. 88-6, Stefani Dep. at pp. 533-34, PageID.2824-25.) Adcock refused payment to Angelo Sr., Dominic, and the John Trust because their Warrants had expired 60 days after the Company paid the outstanding principal balances on their respective Notes. (ECF No. 88-10, Adcock Dep. at p. 47, PageID.3718 (Adcock acknowledging that he alone made the decision not to pay on the Warrants for Angelo Sr., Dominic, and the John Trust, and that he did not talk to Dominic or Angelo Sr. about the Warrants expiring within 60 days of their respective Note payments).) The Company honored Angelo Jr.'s Warrant because it was exercised within 60 days after his Notes were paid in full.

### 4. Iafrate Family Members' Litigation Against AII and Adcock

In April 2018, the Iafrate Family Members sued Adcock and AII in federal court, alleging, in relevant part, securities fraud and state law claims for breach of contract, reformation, unjust enrichment, and fraud, based on the Company's refusal to honor the Warrants. *Iafrate, et al. v. Angelo Iafrate, Inc., et al.*, Case No. 18-cv-11150 (E.D. Mich.) (Tarnow, J.). In that case, Judge Tarnow determined that the Family Members failed to state plausible security fraud claims, and thus the Court dismissed the security fraud claims and remanded the state law claims to state court.

11

*Iafrate, Sr. v. Angelo Iafrate, Inc.*, No. 18-cv-11150, 2019 WL 1863816 (E.D. Mich. Apr. 25, 2019).

The Family Members appealed this decision, and the Sixth Circuit Court of Appeals affirmed. *Iafrate, Sr. v. Angelo Iafrate, Inc.*, 827 F. App'x 543 (6th Cir. 2020). The Sixth Circuit stated that "[t]he terms of the Warrants are unequivocal," and found that "Plaintiffs' failure to understand the consequences of the terms of their deal with Defendants does not mean Defendants [committed fraud] by not correcting Plaintiffs' mistaken impression." *Id.* at 548, 551.

The Family Members then filed a second lawsuit against Adcock and AII in the Wayne County Circuit Court, alleging state law claims for breach of contract, reformation, unjust enrichment, and fraud. *Iafrate v. Angelo Iafrate, Inc.*, Case No. 19-009098-CB (Wayne Cnty. Cir. Ct.). The state circuit court dismissed this lawsuit, and the Family Members appealed. On January 27, 2022, the Michigan Court of Appeals affirmed the trial court, concluding that it was "starkly inescapable that plaintiffs … mutually agreed to waive the pro-rata provision of § 1.4 of Angelo Sr.'s Promissory Notes" and "through course of conduct" they mutually waived the same provisions in Dominic's and the Trust's Notes. *Iafrate v. Angelo Iafrate, Inc.*, No. 355597, 2022 WL 259248, at *8-9 (Mich. Ct. App. Jan. 27, 2022) (concluding that the Warrant language is unambiguous and that "plaintiffs failed to understand the

12

legal ramifications of their waivers of the prohibitions against pro rata payments").

The Michigan Court of Appeals further noted that:

> [A] plaintiff may not willfully close his eyes to that which others clearly see. Plaintiffs could have read the plain and unambiguous language of their Warrants. Although there are rare circumstances under which failing to advise someone of the law – which all persons are otherwise presumed to know – may be actionable, generally something more than mere silence is required, even where a fiduciary relationship exists.

*Id*. at *10 (internal citations and quotations omitted, emphasis added).

## B.    Procedural History

On June 28, 2018, Plaintiffs Angelo Iafrate, Sr., Dominic Iafrate, and Angelo Iafrate, Sr. as Trustee of the John Iafrate Irrevocable Trust filed their original Complaint in this case against Defendant Warner Norcross & Judd, LLP, asserting the following claims: Count I – Professional Liability and Professional Negligence; Count II – Breach of Fiduciary Duty; Count III – Fraudulent Misrepresentation; and Count IV – Fraudulent Concealment. (ECF No. 1, Compl.) Plaintiffs assert these same four claims in the operative Second Amended Complaint. (ECF No. 77.)

On September 30, 2022, Defendant WNJ filed the instant motion for summary judgment, arguing that all four of Plaintiffs' claims must be dismissed because, even accepting all evidence in the light most favorable to Plaintiffs, there is no genuine

issue as to any material fact, and WNJ is entitled to judgment as a matter of law. (ECF No. 88.)

WNJ asserts that it did not represent the individual Family Members, that Plaintiffs' legal malpractice and breach of fiduciary duty claims are barred by the applicable statutes of limitation, that Plaintiffs' fraud claims are barred by the doctrines of res judicata and collateral estoppel, that Plaintiffs cannot establish the requisite probable cause for legal malpractice, and that Plaintiffs' fraud and breach of fiduciary duty claims fail as a matter of law.

On October 19, 2022, Plaintiffs filed their Response in opposition to Defendant WNJ's motion for summary judgment. (ECF No. 89.) Plaintiffs assert that they did have an attorney-client relationship with WNJ, that their legal malpractice and breach of fiduciary duty claims are timely, that neither res judicata nor collateral estoppel apply here, that questions of fact regarding proximate cause exist, and that their fraud and breach of fiduciary duty claims should go to the jury.

Defendant WNJ filed a Reply brief on November 2, 2022. (ECF No. 90.) WNJ contends that Plaintiffs' Response relies on unsupported, conclusory arguments and gross mischaracterizations of the record, that Plaintiffs never had an attorney-client relationship with WNJ, and that Plaintiffs' claims fails as a matter of law.

## II.  LEGAL STANDARD

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley*

*Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Instead, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)). That evidence must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

# III. ANALYSIS

## A. Whether Plaintiffs Had an Attorney-Client Relationship With WNJ (Count I)

Plaintiffs assert a claim in Count I of their Second Amended Complaint against WNJ for professional liability and professional negligence – in other words, for legal malpractice. (ECF No. 77, Count I.) Plaintiffs allege that WNJ established an attorney-client relationship with them, individually, as shareholders of AICC, when WNJ was contacted for the purpose of advising the individual shareholders regarding the potential sale of AICC to an ESOP. (*Id.* ¶¶ 55-56.) Plaintiffs contend that WNJ "issued opinion letters to individual shareholders, provided tax advice, drafted the Intercreditor Agreement which benefited only individual family members in the course of the ESOP, and provided advice on tax structure positions favorable to Plaintiffs with respect to tax matters." (*Id.* ¶ 57.) Plaintiffs further assert that WNJ "never advised the shareholders or the individual family members that they should engage the services of independent, separate ESOP counsel for all aspects of the transaction," and "never secured any waivers of the conflict of interest that might exist in these relationships." (*Id.* ¶¶ 59-60.) All of these contentions relate to the pre-ESOP time period.

To establish a legal malpractice claim in Michigan, a plaintiff must demonstrate: (1) the existence of an attorney-client relationship; (2) negligence in the legal representation of the plaintiff; (3) that the negligence was the proximate cause of an injury; and (4) the fact and extent of the injury alleged. *Simko v. Blake*, 448 Mich. 648, 655 (1995) (citations omitted). "The rendering of legal advice and legal services by the attorney and the client's reliance on that advice or those services is the benchmark of an attorney-client relationship." *Macomb Cnty. Taxpayers Ass'n v. L'Anse Creuse Pub. Schs.*, 455 Mich. 1, 11 (1997). "[A] formal contract is not necessary to create this relationship" and "[t]he contract may be implied from the conduct of the parties." *Id.* (quoting Am. Jur. 2d, Attorneys at Law, § 118, pp. 187-88). "An attorney-client relationship exists if the conduct shows that (1) a potential client sought the advice or assistance of an attorney, (2) this advice or assistance was within the attorney's competence, and (3) the attorney agreed to or *actually provided* that advice or assistance." *Cohen v. Jaffe Raitt Heuer and Weiss, P.C.*, 768 F. App'x 440, 443 (6th Cir. 2019) (emphasis in original) (citing *Macomb Cnty.*, 455 Mich. at 11) "Ultimately, this factual question 'depends on the relations and mutual understanding of the parties, on what was said and done, and all the facts and circumstances of the particular undertaking.'" *Id.* (collecting cases).

18

Defendant WNJ argues in its motion for summary judgment that Plaintiffs' legal malpractice claim fails because there was no attorney-client relationship between WNJ and Plaintiffs. (ECF No. 88, Def.'s Mot., PageID.1893-99.) WNJ contends that it represented the Company, AICC, only, and not the Plaintiff shareholders of the Company, individually, and that there is in fact no evidence that Plaintiffs Angelo Sr., Dominic, or John ever even spoke to or interacted with, let alone entered a contract with, WNJ or Stemple. (*Id.* PageID.1895-96.) WNJ states that "[i]t has been long established that '[w]here an attorney represents a corporation, the attorney's client is the corporation and not the shareholders.'" (*Id.* PageID.1893, quoting *Scott v. Green*, 140 Mich. App. 384, 400 (1985) (Kirwan, J., concurring in part).)

Plaintiffs argue in their Response brief that they had an attorney-client relationship with WNJ because they repeatedly sought legal advice from WNJ before the ESOP closing, which the firm provided without stating that it was not Plaintiffs' legal counsel, and that WNJ prepared several documents for Plaintiffs' benefit in the ESOP transaction, including the Promissory Notes, the Warrants, the

19

Intercreditor Agreement, and the Section 1042 tax election documents. (ECF No.

89, Pls.' Resp., PageID.4408.)[3]

---

[3] Plaintiffs state that WNJ was involved in a prior legal malpractice case which Plaintiffs contend is instructive here regarding the existence of an attorney-client relationship, citing *Schiefler v. Warner, Norcross & Judd, LLP*, No. 262425, 2006 WL 448715 (Mich. Ct. App. Feb. 23, 2006). (ECF No. 89, Pls.' Resp., PageID.4406-08.) In *Schiefler*, WNJ provided legal advice and services to both the plaintiff in that case, a shareholder and director of a corporation, as well as the corporation itself, from the 1970's until the plaintiff's "ouster" from the corporation in 2001. *Id.* at *1-2. WNJ prepared a buy-sell agreement for the plaintiff and the one other shareholder of the company in 1996, and WNJ later prepared a shareholder resolution for the corporation adding a third director to the board, but it failed to advise the plaintiff that this addition could result in the forced sale of his interest in the company by majority vote under the 1996 buy-sell agreement. *Id.* That is exactly what happened, and after his ouster from the company in November 2001, the plaintiff brought a legal malpractice claim against WNJ, alleging that the firm committed malpractice by preparing and tendering the shareholder resolution without advising plaintiff that it could result in his ouster from the company. *Id.* at *2. The trial court granted defendant WNJ's motion for summary disposition on the basis that WNJ did not represent the plaintiff in connection with drafting the shareholder resolution, but only represented the corporation, and thus WNJ had no duty to advise regarding the consequences of that resolution. The Michigan Court of Appeals reversed, finding that "reasonable minds could differ regarding whether the parties' relationship necessarily encompassed the advice relating to the shareholder resolution," and as to whether WNJ owed plaintiff a duty, that was breached.

  Defendant WNJ argues in its Reply brief that *Schiefler* is inapposite to the attorney-client relationship issue here – whether any attorney client relationship existed at all between Plaintiffs and WNJ. (ECF No. 90, Def.'s Reply, PageID.5381-82.) The Court agrees. Contrary to Plaintiffs' assertion here, the issue in *Schiefler* was not whether the defendant firm had an attorney-client relationship with the plaintiff at all – the Michigan Court of Appeals stated that "it is undisputed that plaintiff and defendant had a decades-long attorney-client relationship, … which encompassed all of plaintiff's personal and business matters[.]" *Id.* Rather, the issue was whether, because of that relationship, defendant had a duty to advise plaintiff of

WNJ argues that Plaintiffs did not "seek or receive" legal advice or assistance from Stemple/WNJ because Dominic and John Iafrate both admit that they never spoke to, or communicated in writing with any WNJ attorney, and although Angelo Sr. died before he could be deposed, Stemple confirmed that he never met with, spoke to, or communicated with Angelo Sr. in any way. (ECF No. 88, Def.'s Mot., PageID.1895-96, citing ECF No. 88-14, John Iafrate Dep. at pp. 48-50, PageID.3901-03; ECF No. 88-15, Dominic Iafrate Dep. at pp. 32, 61-70, PageID.3982, 4011-20; ECF No. 88-16, Stemple Dep. at p. 16, PageID.4124.) WNJ contends that Stemple interacted with Angelo Jr. only in his capacity of CEO and President of AICC, and not in any other capacity. Angelo Jr. acknowledged in his deposition that he was the "contact person on behalf of AICC during this 2013 time period when the ESOP transaction was being formulated, contemplated, and executed." (ECF No. 88-9, Angelo Jr. Dep. at p. 531, PageID.3150.)

Plaintiffs do not dispute that they personally never met with or spoke directly to WNJ/Stemple. They contend that they instead always acted through Angelo Jr.. John and Dominic Iafrate testified that they relied on Angelo Jr. as their "point man"

---

the implications and risks of the shareholder resolution. *Id.* at *3. The Michigan Court of Appeals held that a fact issue existed regarding this issue and thus reversed the trial court's grant of summary disposition and remanded for further proceedings consistent with its opinion.

for the Family Members related to the ESOP transaction. (ECF No. 88-14, John Iafrate Dep. at p. 62, PageID.3915); (ECF No. 88-15, Dominic Iafrate Dep. at pp. 9, 65-66, 96, PageID.3959, 4015-16, 4946); (ECF No. 88-9, Angelo Jr. Dep. at pp. 759-61, PageID.3427-29.) Adcock similarly testified that he understood or assumed that Angelo Jr. was communicating with the Family Members/AICC shareholders during the ESOP formation transaction, and that Angelo Jr. would speak on behalf of the Family Members/shareholders during the pre-closing period. (ECF No. 88-10, Adcock Dep. at p. 23, PageID.3694.)

Plaintiffs do not dispute that WNJ/Stemple had an attorney-client relationship with AICC in 2013 related to the ESOP transaction. Plaintiffs instead contend that WNJ nevertheless also established an attorney client relationship with them as well, individually, through its course of conduct "from the outset through the closing of the ESOP transaction." (ECF No. 89, Pls.' Resp., PageID.4409-10.) Plaintiffs assert that WNJ/Stemple responded to Plaintiffs' pre-ESOP questions (through Angelo Jr.), provided legal advice, and drafted documents for Plaintiffs, upon which Plaintiffs reasonably relied. Angelo Jr. testified that it was "clear in [his] head who [he] was working with during" the ESOP transaction, "[i]t was Justin [Stemple]." (ECF No. 88-9, Angelo Jr. Dep. at p. 547, PageID.3166 (stating "99 percent of my dealings on that transaction, important issues, were with Justin [Stemple].").)

22

Stemple admits that he never advised Angelo Jr. that he (Stemple) was not representing the Family Members' individual interests in the ESOP transaction. (ECF No. 88-16, Stemple Dep. at pp. 123-24, PageID.4231-32.)

Stemple drafted the Intercreditor Agreement for Plaintiffs, which only addressed potential issues between Plaintiffs (as creditors of the Company post-closing), and which in no way served AICC. (ECF No. 89-6, Intercreditor Agreement, PageID.4725-29.) Indeed, the Intercreditor Agreement, dated December 6, 2013, states that it is "between ANGELO IAFRATE SR., DOMINIC IAFRATE, ANGELO E. IAFRATE [JR.] and the JOHN IAFRATE IRREVOCABLE TRUST u/a/d 1/1/88 (collectively the "Creditors")."

The Court finds that Stemple's drafting of this document, which he did solely for Plaintiffs' benefit in the upcoming ESOP transaction, is evidence creating a fact issue as to the existence of a limited attorney-client relationship between Plaintiffs and Defendant WNJ in 2013.

WNJ's assertion in its motion that Stefani came up with the concept for the Intercreditor Agreement, or that Stefani also represented the Plaintiffs during the time of the ESOP transaction, does not change this analysis. WNJ asserts that attorney Stefani, not Stemple, was acting as "Family counsel," and that Stefani was scrutinizing the transactional documents on behalf of the Family Members. WNJ

states that Stefani's work included forming the new S-corp (AII), drafting the August 1, 2013, Consent Resolution, and obtaining the signatures of Dominic and Angelo Sr. on the Consent Resolution. (*See* ECF No. 88-6, Stefani Dep. at pp. 99 (stating that he and Stemple represented the "family members" in the ESOP transaction), 101, 116, 325-38, PageID.2321, 2323, 2338, 2577-80.) However, a person may retain more than one attorney, and thus Plaintiffs could retain Stefani in addition to Stemple.[4] *See Maddox v. Burlingame*, 205 Mich. App. 446, 451 (1994) (noting that "plaintiff's Florida counsel was not consulted in place of, but in addition to, defendant [law firm]"); *Bernstein v. Seyburn, Kahn, Ginn, Bess, & Serlin Corp.*, No. 313894, 2014 WL 688652, at *4 (Mich. Ct. App. Feb. 20, 2014) ("Plaintiff contacted Gross as additional, rather than substitute counsel"). Stefani was admittedly not an ESOP expert; Stemple was, and Plaintiffs and Stefani testified that they relied on Stemple's advice, as an expert on the ESOP issues/transaction. (ECF No. 88-6, Stefani Dep. at pp. 16-17, PageID.2238-39 (Stemple "was running both sides of the deal with their consent"); pp. 115-16, PageID.2337-38 ("[W]e worked as a team, Justin [Stemple] and I. And I had certain responsibilities and that's what I did, my

---

[4] Adcock has testified that AICC similarly retains several attorneys for different matters, such as workman's comp or general liability, and that WNJ is its attorney for the ESOP matters. (ECF No. 88-10, Adcock Dep. at p. 16, 22, PageID.3687, 3693.)

responsibilities. Justin was totally responsible for the ESOP, for the warrants."); pp. 312-13, PageID.2564-65.)[5]

Plaintiffs further point out that WNJ/Stemple advised them on Internal Revenue Code section 1042 tax election issues before the ESOP closing, which is a tax benefit available to shareholders, and not to a company or its employees. WNJ/Stemple prepared the section 1042 tax election documents for Plaintiffs as part of the ESOP transaction. When WNJ billed the Company for this legal work in July 2014, the Company directed that the invoices for this work should be charged back to the Iafrates, personally, and for reductions in the next quarterly payments on

---

[5] WNJ cites to an August 2013 email from Stemple to Angelo Jr., wherein Stemple asked Angelo Jr. how discussions were going with the Family Members regarding the ESOP sale, as evidence that Stemple did not represent the Family Members because he did not inquire of the Family Members directly. (ECF No. 88, Def.'s Mot., PageID.1989, fn.5.) However, an argument could be made that this email is evidence supporting WNJ's representation of the Iafrate Family Members, individually, in the ESOP transaction, and that Stemple was simply going through Angelo Jr., as the agreed "point man."

Stemple also emailed Angelo Jr. in September 2013 regarding the handling of a sum of money owed to AICC by the Family Members and the potential alternatives and tax implications to the Family. (ECF No. 89-10, Email, PageID.5215-16.) In addition, in December 2013, just prior to the closing, Stemple and Angelo Jr. exchanged emails discussing a change to the language in the Warrants to allow the Holder to request stock or cash. (ECF No. 89-7, Email, PageID.4731.) These emails further evidence Stemple's provision of pre-ESOP legal advice and assistance to Angelo Jr. in 2013 in his position of shareholder and a Family Member, instead of his position as President and CEO of AICC.

Plaintiffs' promissory notes sufficient to cover those legal expenses. Thus, while WNJ did not bill Plaintiffs directly for work performed, Plaintiffs ultimately paid for legal work Stemple performed on their behalf. (ECF No. 88-10, Adcock Dep. at pp. 112-13, PageID.3783-84); (ECF No. 88-16, Stemple Dep. at p. 75, PageID.3183 ("Yes, I drafted a set of 1042 forms as part of the general transaction documents.").).

As  Adcock testified:

> Q.  Did you charge back to the Iafrates the amounts that Warner Norcross billed to Iafrate Construction Company for work on the Section 1042 election?
>
> A.  I backcharged this invoice amount, yes.
>
> Q.   Okay. And that was because the legal work that the Warner Norcross firm had done was, in your opinion, work that *solely benefited the shareholders, meaning the Iafrate family members, and not the corporation, correct*?
>
>                         ***
>
> A· It appeared to me it was done for the previous owners, yes.
>
> Q.  And it was of *no benefit to AICC*?
>
> A.  *Not that I was aware of.*

(*Id.* PageID.3784 (emphases added).) The Court finds that this further creates a fact issue as to the existence of an attorney-client relationship between Plaintiffs and

WNJ, at least in a limited capacity, in the 2013 time period with regard to the ESOP transaction.

Plaintiffs also assert that WNJ's initial presentation to Angelo Jr. in the summer of 2013 regarding the benefits of forming an ESOP focused on the benefits to the "owners"/shareholders of the company (which included Angelo Jr., and Plaintiffs), including discussing the election of a section 1042 tax benefit to avoid treatment of the sale proceeds as capital gains, preserving the name and legacy of the company, rewarding employees who had long served the company, and having a ready buyer to whom the shareholders could sell their shares at Fair Market Value. (ECF No. 88-6, Stefani Dep. at pp. 78, PageID.2300 (noting that the presentation "emphasized those advantages to the sellers")); (ECF No. 88-16, Stemple Dep. at pp. 76-77, PageID.4184-85); (ECF No. 89-2, V. Saper Dep. at p. 11-19, PageID.4442-50 (discussing the advantages of an ESOP to a seller/shareholder individually).) Plaintiffs contend that Stefani understood that WNJ appeared to be legal counsel for <u>all</u> parties involved in the ESOP transaction and point out that WNJ did not otherwise define the scope of its representation to Plaintiffs, or state that it was not representing Plaintiffs (despite drafting the Intercreditor Agreement and section 1042 documents). (*See* ECF No. 88-6, Stefani Dep. at pp. 17, 38, 71-72, PageID.2239, 2260, 2293-94.) Plaintiffs contend that this is further evidence

27

creating a fact issue as to the existence of a limited attorney-client relationship between Plaintiffs and WNJ regarding the formation of the ESOP.

The Court acknowledges that WNJ cites, in support of its argument that it only had an attorney-client relationship with the Company and not the individual shareholders, an engagement letter dated February 26, 2013, and addressed to "Mr. Angelo Iafrate, Angelo Iafrate Construction Company," which stated that WNJ was selected "to represent Angelo Iafrate Construction Company" and "assist Angelo Iafrate Construction Company with employee benefits work implementing an Employee Stock Ownership Plan." (ECF No. 88, Def.'s Mot., PageID.1894, citing ECF No. 88-11, Ex. J., Engagement Letter, PageID.3842-47.) WNJ states that no Family Members are named as clients in the engagement letter. (*Id.*) However, as Plaintiffs argue in their Response brief, there is no evidence that this engagement letter was ever sent to, received by, or agreed to, by Plaintiffs. Plaintiffs point out that the "Engagement Letter" is not on WNJ letterhead, and it is not signed by the author of the letter, WNJ partner Vernon Saper. Further, Saper testified that he has no independent recollection of writing the letter, no evidence that it was sent or received, and no evidence that it was ever acknowledged by Angelo Jr. (ECF No. 89-2, Vernon Saper Dep. at pp. 34, 52-55, PageID.4465, 4483-86.) Stemple similarly testified that he has no evidence that the letter was ever sent or received. (ECF No.

28

88-16, Stemple Dep. at pp. 14-15, 17-18, PageID.4122-23, 4125-26.) And Angelo Jr. testified that he never received the Engagement Letter. (ECF No. 88-9, Angelo Jr. Dep. at p. 596, PageID.3215.) Accordingly, the Court finds that the purported "Engagement Letter" does not negate the existence of an attorney client relationship between Plaintiffs and WNJ. *See Cohen v. Jaffe, Raitt, Heuer & Weiss, P.C.*, No. 16-CV-11484, 2018 WL 1089723, at *3 (E.D. Mich. Feb. 28, 2018) ("As to the lack of a written engagement letter, Jaffe could have limited the scope of its representation with an engagement letter clearly informing Chaffee and Cohen that their other companies were not clients. Jaffe cannot use it failure to provide an engagement letter as a defense to malpractice."), *aff'd*, 768 F. App'x 440 (6th Cir. 2019); *compare Marks v. Schafer & Weiner, PLLC*, No. 20-11059, 2021 WL 1056774, at *5 (E.D. Mich. Mar. 19, 2021) (granting summary judgment to law firm and attorney defendants "because they and Marks signed a retainer agreement making clear that Defendants would be representing four corporate entities, … and that they would not be representing Marks in his individual capacity," and noting that while emails showing that the law firm provided assistance to Marks, individually, "might be relevant for determining whether an implied attorney-client relationship existed in the absence of an unequivocal retainer, it has no relevance

where an express contract declared that Defendants did not represent Marks individually.").

WNJ also relies on a pre-ESOP "Consent Resolution" effective August 1, 2013, signed by Angelo Sr. individually and on behalf of the John Trust, and Dominic Iafrate, authorizing "Angelo E. Iafrate, President" of AICC "to work in conjunction with the law firm of [WNJ], the appraisal firm of Stout Risius Ross, the brokerage firm of UBS, the Company's CPA Bill Kingsley and the Company's attorneys Stefani & Stefani to design, adopt and implement an [ESOP] for the Company's employees," including "negotiating and executing all documents in connection with the design, adoption, funding and implementation of the ESOP." (ECF No. 88, Def.'s Mot., PageID.1894-95, citing ECF No. 88-13, Consent Resolution, PageID.3852.) The Resolution states that "any and all agreements, documents or instruments executed by Angelo E. Iafrate pursuant to these resolutions are hereby ratified and confirmed and shall be fully binding upon the Company and all third parties are entitled to rely on the same." (*Id.*) WNJ asserts that the Family Members never presented a similar consent resolution authorizing Angelo Jr. to act for them individually. (ECF No. 88, Def.'s Mot., PageID.1895.)

Plaintiffs do not address this Consent Resolution in their Response brief. In any event, the Court find that this document, alone, authorizing Angelo Jr. to act on

behalf of the Company and its shareholders/directors, is not dispositive of whether Plaintiffs, as individuals, had even a limited attorney-client relationship with Defendant in 2013.

Based on the above, and viewing the facts in the light most favorable to Plaintiffs, the Court finds that there is a fact issue as to whether the pre-ESOP legal advice and work WNJ/Stemple provided to Plaintiffs in 2013, in their capacity as shareholders of AICC, culminating in the formation of the ESOP on December 6, 2013, specifically encompassed the work that Plaintiffs and the Company sought regarding the ESOP, and thus whether Plaintiffs, as shareholders of AICC, and Defendant WNJ had a limited attorney-client relationship during the formation of the ESOP in 2013, with respect to that transaction. *See Cohen*, 768 F. App'x at 443 (noting that "this factual question 'depends on the relations and mutual understanding of the parties, on what was said and done, and all the facts and circumstances of the particular undertaking.'").

The Court further finds, however, that Plaintiffs have presented no evidence of a continuing attorney-client relationship with Stemple and Defendant WNJ following the December 6, 2013, closing of the ESOP transaction, after Plaintiffs ceased being shareholders and instead became creditors of the Company.

A series of emails during the March and April 2016 time period regarding ESOP documents and prepayments on the Notes, are between Stefani, on behalf of the Family Members, and Adcock only, at times copying Angelo Jr. or Dominic Iafrate; Stemple is not included on any of those emails. (See ECF No. 88-17, Emails, PageID.4365-68.)

Plaintiffs' counsel confirmed during the summary judgment hearing that Plaintiffs did not approach Stemple or WNJ for legal advice following the ESOP closing in December 2013. Stefani testified in his deposition that he was acting as counsel for the Iafrate Family Members during that time through 2018, when Plaintiffs attempted to exercise their Warrants. It was Stefani who submitted letters to the Company attempting to exercise the Warrants of Angelo Sr., the John Trust, and Dominic Iafrate. (ECF No. 88-6, Stefani Dep. at pp. 533-35, 547-53, PageID.2724-26, 2838-44.) Thus, the evidence shows that Stefani alone was acting as counsel for Plaintiffs during the post-December 2013 time period, not Stemple, and during the time of the prepayments on the Notes to Plaintiffs and the Plaintiffs' attempts to exercise their Warrants. Thus, the Court finds that there is no fact issue as to whether Plaintiffs had an attorney-client relationship with WNJ following the closing of the ESOP transaction in December 2013.

However, a finding that Plaintiffs have presented a fact issue as to the existence of a limited attorney-client relationship with Defendant in 2013 is relevant to just one element of Plaintiffs' legal malpractice claim. As explained above, to establish a legal malpractice claim in Michigan, a plaintiff must demonstrate, in addition to the existence of an attorney-client relationship, negligence in the legal representation of the plaintiff, that the negligence was the proximate cause of an injury, and the fact and extent of the injury alleged. *See Simko*, 448 Mich. at 655. Further, the claim must be timely pleaded.

For the reasons that follow, the Court finds that Plaintiffs' legal malpractice claim in Count I of their Amended Complaint nevertheless does not survive summary judgment.

### B. Whether Plaintiffs' Professional Liability (Count I) and Breach of Fiduciary Duty (Count II) Claims are Time-Barred

Under Michigan law, "[a] legal malpractice claim must be brought within two years of the date the claim accrues, or within six months after the plaintiff discovers or should have discovered the existence of the claim, whichever is later." *Kloian v. Schwartz*, 272 Mich. App. 232, 237 (2006) (citing Mich. Comp. Laws 600.5805(1) and (6), 600.5838(1)). A legal malpractice claim accrues when the lawyer stops serving the plaintiff in a professional capacity on the matter giving rise to the claim.

33

Mich. Comp. Laws 600.5838(1). *See Maddox*, 205 Mich. App. at 450 ("A lawyer discontinues serving a client … upon completion of a specific legal service that the lawyer was retained to perform.").

Under the statute of repose, an action for legal malpractice must be commenced within six years of the act or omission giving rise to the claim or before the expiration of the period of limitations in Mich. Comp. Laws 600.5805, whichever period is earlier. Mich. Comp. Laws 600.5838b(1). Ministerial or minor follow-up acts after discontinuation of representation will not work to extend the period of representation and create a new date of accrual. *Bauer v. Ferriby & Houston, P.C.*, 235 Mich. App. 536, 539 (1999) (concluding that "the proper inquiry is whether the new activity occurs pursuant to a current, as opposed to a former, attorney-client relationship."). To be ministerial, any contacts with the client should be brief and must not be billed. *Maddox*, 205 Mich. App. at 451 (stating that billing for new services constitutes an acknowledgement of continued representation in a matter).

A claim of breach of fiduciary duty under Michigan law must be brought within three years of the date the claim accrues, and a claim accrues "when the beneficiary knew or should have known of the breach." *Prentis Family Foundation v. Barbara Ann Karmanos Cancer Inst.*, 266 Mich. App. 39, 47 (2005) (citations omitted). When the plaintiff alleges that the defendant fraudulently concealed the

34

existence of a claim, the "action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations." Mich. Comp. Laws 600.5855; *Bernstein*, 2014 WL 688652, at *5.

WNJ contends that Plaintiffs' legal malpractice and breach of fiduciary duty claims are centered around Stemple's actions in negotiating and drafting the ESOP transaction documents, which transaction closed on December 6, 2013. WNJ argues that Plaintiffs' Complaint, filed on June 28, 2018, is therefore time-barred and should be dismissed. (ECF No. 88, Def.'s Mot., PageID.1899-1901.) WNJ further contends that Plaintiffs' claims, which are based on the language in the Warrants (which language both the United States Sixth Circuit Court of Appeals and the Michigan Court of Appeals have deemed "unequivocal" and "plain and ambiguous"), are not saved by the six-month discovery rule, because those Warrants were provided to Plaintiffs to review and sign prior to the December 6, 2013 closing, and the executed versions of the Warrants were provided to Plaintiffs in the closing binder shortly thereafter. (*Id.*) WNJ further argues that "to the extent ... Plaintiffs rely on the events before the December 6, 2013 closing ... as the basis for their fiduciary duty claim, that claim must be dismissed because Plaintiffs should have

35

known of any possible breach no later than when they signed the closing documents (which included the unambiguous Warrants), or when they received the closing binder." (*Id.*)

Plaintiffs argue in their Response brief that WNJ has never indicated that the attorney-client relationship changed or was terminated, and that Plaintiffs did not learn until February 2018, when they received written rejections of their Warrants, that WNJ "was not only conflicted, but that its preparation of the transactional documents in 2013 was negligent, and contrary to [Plaintiffs'] best interests." (ECF No. 89, Pls.' Resp., PageID.4412-13.) Plaintiffs assert they filed their Complaint approximately four months later, on June 28, 2018, "well within the six month discovery provision of MCL 600.5838(2) for legal malpractice, the three-year statute of limitations for breach of fiduciary duty, and the two years for fraudulent concealment." (*Id.*) Plaintiffs further contend that, even if the cause of action accrued when the Warrants were "prepared and delivered to Plaintiffs in November 2013," they are within the six year statute of repose. (*Id.*) Plaintiffs assert that WNJ "did not manifest its conflict of interest in its secret exchange of advice and information to Adcock until December 2016, and the conflict only became evident to Plaintiffs upon the wrongful rejection of their Warrants in February 2018." (*Id.*)

36

First, as to Plaintiffs' legal malpractice claim in Count I of their Complaint, which, as discussed above, can be based only on WNJ's alleged actions in negotiating and drafting the ESOP documents in 2013, and in particular the Warrants, the Court finds that that claim is time-barred. A legal malpractice claim accrues at the time an attorney discontinues serving the plaintiff in a professional capacity "*as to the matters out of which the claim for malpractice arose*…." MCL 600.5838(1) (emphasis added); *see Voutsaras v. Bossenbrook*, No. 345493, 2020 WL 908495, at *5 (Mich. Ct. App. Feb. 25, 2020) (finding legal malpractice claim accrued when client executed documents setting up trust (even though client did not pick up her file until months later) and noting that there is no evidence demonstrating that attorney's representation continued past that date). Thus, Plaintiffs' legal malpractice claim against WNJ accrued no later than December 6, 2013 and should have been brought by December 6, 2015. Therefore, Plaintiffs' Complaint in this matter filed on June 28, 2018 was untimely.

The same finding applies with respect to Plaintiffs' breach of fiduciary duty claim in Count II, to the extent that claim is based on WNJ's actions in 2013, and any duty owed to Plaintiffs as shareholders of AICC at that time. As discussed above, Plaintiffs, at best, raise a fact question as to the existence of a limited attorney-client relationship with WNJ/Stemple during the formation of the ESOP (drafting the

Intercreditor Agreement and preparing the Section 1042 tax documents), which closed on December 6, 2013. Plaintiffs have presented no evidence raising a genuine issue of material fact as to the existence of a continuing attorney-client relationship with WNJ/Stemple after December 6, 2013. In fact, as discussed above, the evidence supports a finding that attorney Stefani, alone, acted as counsel for the Iafrate family members following the ESOP closing.

Plaintiffs contend that they did not "discover" WNJ's alleged negligence in preparing the ESOP documents until February 2018, when their attempts to exercise their Warrants were rejected by Adcock. However, the discovery rules provide additional time after "the plaintiff discovers *or should have discovered* the existence of the claim, whichever is later." *See Kloian*, 272 Mich. App. at 237 (citing Mich. Comp. Laws 600.5805(1) and (6), 600.5838(1)). Plaintiffs had possession of the Warrants, which they signed, since at least December 2013.

As the United States Sixth Circuit Court of Appeals and Michigan Court of Appeals have found, and this Court agrees, the Warrants are unambiguous and unequivocal and plainly provide that the Warrants "shall terminate on, and may no longer be exercised on or after, the date that is 60 days after the date that the Company has paid in full both the Senior Promissory Note and Junior Promissory [Note] issued by the Company in favor of the Holder." (ECF No. 88-5, Common

Stock Warrant issued to Dominic, PageID.2179-85.) "Note" and "Holder" are both singular. "The only possible interpretation of this language is that the specific Warrant would be triggered when the particular Promissory Notes held by *the holder of that Warrant* were paid *by the Company*." *Iafrate*, 2022 WL 259248, at *8 (emphases in original). Plaintiffs are presumed to know and understand the contents of the documents they sign. *See McKinstry v. Valley Obstetrics-Gynecology Clinic, P.C.*, 428 Mich. 167, 184 (1987) ("Michigan law further presumes that one who signs a written agreement knows the nature of the instrument so executed and understands its contents.") (citations omitted); *see also Eschenbacher v. Hier*, 363 Mich. 676, 682 (1961) (stating that a plaintiff will be held to know what he ought to have discovered through the exercise of ordinary diligence). Plaintiffs therefore "should have discovered" the plain language in the Warrants in 2013, but they instead failed to read and follow the unambiguous language in those documents and exercise the Warrants within 60 days of the final payment on their respective Notes.

Plaintiffs do not claim that they requested any clarification or advice from Stemple regarding the exercise of these Warrants following the 2013 closing date, or that they otherwise did not understand the Warrant language. That Plaintiffs' Notes were paid *seriatim*, at Plaintiffs' request and acceptance, does not void the plain language in the Warrants. Plaintiffs' admitted failure to read the Warrants that

39

they signed is unfortunate. Indeed, Dominic testified that he "never read the [closing documents] packet when [he] got it," and he admitted that "[t]he first time [he] read it is after" his Warrant was denied. (ECF No. 88-15, D. Iafrate Dep. at pp. 17, 19, 97, PageID.3967, 3069, 4047.) A plaintiff may not "wilfully close his eyes to that which others clearly see." *Titan Ins. Co. v. Hyten*, 491 Mich. 547, 562 (2012) (citation omitted). Thus, the Court finds that Plaintiffs' legal malpractice and breach of fiduciary duty claims, based on WNJ's alleged actions in 2013 in connection with the ESOP transaction, are time barred and not saved by the discovery rule.

Plaintiffs' reliance on the statute of repose is misplaced. That statute provides that a legal malpractice action must be commenced *either* by the expiration of the application limitations period *or* six years after the date of the act or omission that is the basis for the claim, *whichever is earlier*. MCL 600.5838b. For claims accruing in December 2013, that limitations period expired in December 2015 (legal malpractice) and December 2016 (breach of fiduciary duty). And for the reasons explained above, Plaintiffs should have discovered any alleged malpractice with regard to the ESOP transaction documents by December 2013, and they cannot rely on the statute of repose to save their time-barred claims.

Finally, as for Plaintiffs' breach of fiduciary duty claim based on Plaintiffs' broad allegation that WNJ "owed continuing duties and obligations to Plaintiffs in

40

2017 and 2018 that they have actively breached," as stated above, Plaintiffs have provided no evidence of a continuing attorney-client relationship between Plaintiffs and WNJ after the December 2013 closing of the ESOP transaction. The absence of an attorney-client relationship does not necessarily mean that there is no fiduciary duty; rather it simply means that a fiduciary duty cannot be established as a matter of law. *Fassihi v. Sommers, Schwartz, Silver, Schwartz & Tyler*, 107 Mich. App. 509, 514-15 (1981). A plaintiff may claim a breach of fiduciary duty if he can establish factual circumstances in which he reasonably reposed faith, confidence, and trust in the attorney's advice. *Beaty v. Hertzberg & Golden, PC*, 456 Mich. 247, 260-61 (1997). To the extent Plaintiffs can support a breach of fiduciary duty claim based on WNJ's alleged conduct against Plaintiffs in 2017 or 2018, that claim, to the extent it is viable, would not be barred by limitations. That breach of fiduciary duty claim is further addressed *infra*.

For these reasons, Plaintiffs' professional liability and professional negligence claim (Count I) and breach of fiduciary duty claim (Count II) (for claims accruing by December 2013) are dismissed as untimely.

41

### C. Whether Any Act or Omission by Defendant was a Proximate Cause of Plaintiffs' Alleged Damages (Count I)

WNJ further argues that Plaintiffs' legal malpractice claim fails for the additional reason that Plaintiffs cannot show that their claimed damages were a natural and direct result of WNJ's alleged negligence in drafting the ESOP documents. (ECF No. 88, Def.'s Mot., PageID.1903-05.) WNJ asserts that Stemple drafted the documents contemplating pro rata application of any payments on the Promissory Notes in 2013, and that it was *Plaintiffs* who abandoned that approach and who waived the contemplated pro rata payments. WNJ further asserts that Adcock alone (not Stemple) chose to decline the Family Members' Warrants in 2018, believing that, as the ESOP's Trustee, he was obligated to not discuss the 60-day expiration period with the Family Members upon payment on their respective Notes. (*Id.*) (ECF No. 88-10, Adcock Dep. at pp. 46-47, PageID.3717-18 ("I alone made the decision [not to honor the warrants].").)

Adcock explained that he felt that it was his obligation as Trustee of the ESOP to "stay silent," and that Plaintiffs "signed the same closing binder, the same documents that [he] signed" and so he "thought they were well aware" of the 60-day time period to exercise the respective Warrants. (*Id.*)

42

WNJ further asserts that Plaintiffs never communicated with Stemple, pre- or post-closing, regarding the Warrants or their decisions to prepay the Notes on a non pro rata basis. (*Id.*) WNJ contends, therefore, that Plaintiffs cannot demonstrate that anything WNJ did, or did not do, caused their alleged damages.

Plaintiffs argue in their Response brief that the issue of proximate cause is a jury question. (ECF No. 89, Pls.' Resp., PageID.4416-24.) Plaintiffs argue that Stemple failed to identify and address the issues potentially arising from non-simultaneous note payments, and thus failed to "integrate" the transactional documents. Plaintiffs contend that Stemple's drafting of the documents was "internally inconsistent, and not integrated from one document to the next." (*Id.* PageID.4419.) However, because these alleged actions all occurred in the pre-ESOP 2013 time period, any malpractice claim based on these actions or inactions is time barred, for the reasons discussed above.

To prove proximate cause in a legal malpractice action in Michigan, a plaintiff must establish that the defendant's action was a cause in fact of the claimed injury. *Charles Reinhart Co. v. Winiemko*, 444 Mich. 579, 586 (1994). "[T]he plaintiff must present substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred."' *Pontiac Sch. Dist. v. Miller, Canfield, Paddock & Stone*, 221 Mich. App.

43

602, 614 (1997) (quoting *Skinner v. Square D Co.*, 445 Mich. 153, 164-165 (1994)). The mere possibility of causation in fact is not enough and speculation or conjecture cannot support causation. *Id.* at 613-615 (citations omitted).

As WNJ correctly explains in its Reply brief, it is undisputed that it was *Plaintiffs'* decision, years after the ESOP documents were created by WNJ and executed by Plaintiffs, to retire their Notes *seriatim* as opposed to pro rata, and that it was this *seriatim* retirement of the Notes that triggered the exercise deadline in the Warrants earlier than Plaintiffs contend they expected. (ECF No. 90, Def.'s Reply, PageID.5385.) Nothing that WNJ/Stemple did in 2013 in drafting the documents at issue proximately caused Plaintiffs to later vary from the contemplated pro rata payment application or their subsequent failure to timely exercise their Warrants according to the plain language in the Warrants. Thus, it was not the language in the Warrants, or other closing documents, that prevented Plaintiffs from exercising the Warrants, but rather Plaintiffs' complete failure to read and follow the plain language in the Warrants in connection with their decision or agreement, years after the ESOP documents were created, to receive their Note payments *seriatim*, and the events that followed.

Further, as stated *supra*, Plaintiffs fail to offer any evidence that they communicated with or attempted to contact WNJ regarding the Warrants following

the ESOP closing, or the decision to pay the Notes on a non-pro rata basis. And WNJ had demonstrated that it was *Adcock*, acting on behalf of AICC and in his fiduciary status as an ESOP Trustee, not Defendant WNJ, who chose to enforce the Warrants in accordance with their plain and unambiguous language. This further removes any argument that WNJ proximately caused Plaintiffs' damages.

Accordingly, the Court finds that Plaintiffs' legal malpractice claim fails for the additional reason that Plaintiffs fail to provide evidence establishing proximate cause for their legal malpractice claim.

### D. Plaintiffs' Breach of Fiduciary Duty Claim (Count II)

Plaintiffs allege that an attorney engaged by a corporation owes certain fiduciary duties to the shareholders and that WNJ established a fiduciary relationship with Plaintiffs "by furnishing advice and counsel to the individual Plaintiffs, and in particular on matters impacting their sale of their shares to Newco" in 2013. (ECF No. 77, Compl., ¶ 72.) Plaintiffs further allege that WNJ breached its fiduciary duties in "late 2017 and into 2018" (when Plaintiffs were no longer shareholders of the Company) regarding the payment of Plaintiffs' Promissory Notes and Plaintiffs' attempts to exercise their Warrants and that WNJ "failed to properly advise the family member shareholders of the significance in the change of payment method[.]" (*Id.* ¶ 73.)

45

"The elements of a fiduciary duty claim are (1) the existence of a fiduciary duty, (2) a breach of that duty, (3) proximately causing damages." *Delphi Auto. PLC v. Absmeier*, 167 F. Supp. 3d 868, 884 (E.D. Mich. 2016) (citation and internal quotations marks omitted). "Damages may be obtained for a breach of fiduciary duty when a position of influence has been acquired and abused, or when confidence has been reposed and betrayed." *Prentis Family Found.*, 266 Mich. App. at 47.

The Michigan Court of Appeals has held that the absence of an attorney-client relationship does not necessarily mean that there is no fiduciary duty, but rather means that a fiduciary duty cannot be established as a matter of law. *Fassihi*, 107 Mich. App. at 514-15. Thus, a plaintiff may claim a breach of fiduciary duty if he can establish factual circumstances in which he reasonably reposed faith, confidence, and trust in the attorney's advice. *Id.* However, "it is unreasonable for a nonclient to repose confidence and trust in an attorney when any of the interests of the client and the nonclient are adverse." *Beaty*, 456 Mich. at 260-61. The Michigan Supreme Court "has repeatedly declined to recognize a fiduciary obligation running to a potentially adverse party because such a duty would necessarily 'permeate all facets of the litigation' and have a significantly deleterious effect on the attorney's ability to make decisions for the benefit of his client." *Id.* (quoting *Friedman v. Dozorc*, 412 Mich. 1, 23 (1981)).

46

First, to the extent Plaintiffs base their breach of fiduciary duty claim on events before and through the December 6, 2013 ESOP closing, those claims are time barred for the reasons discussed *supra*.[6]

Second, to the extent the alleged actions that Plaintiffs claim constitute the breach of fiduciary duty occurred in 2017 or after, it is undisputed that Plaintiffs were no longer AICC shareholders at that time, because AICC was sold to the ESOP in December 2013. Thus, WNJ owed no duty to Plaintiffs "as shareholders" in 2017 or 2018. Plaintiffs' only relationship with AICC at that time was as creditors of the Company – an adverse relationship. AICC had an interest in making as much money as possible for the Company and the ESOP, while Plaintiffs had an interest in receiving the most money for their Warrants. Thus, under *Beaty*, it was not

---

[6] In addition, to the extent the pre-ESOP conduct in 2013 that Plaintiffs assert give rise to their breach of fiduciary duty claim is the same as the conduct that gives rise to their legal malpractice claim, that breach of fiduciary duty claim would be subsumed by the legal malpractice claim because the only claim that may be brought against one's attorney for inadequate legal services is a claim for legal malpractice. *See Voutsaras*, 2020 WL 908495, at *4-5 (finding plaintiff's breach of fiduciary duty and silent fraud claims subsumed in his legal malpractice claim because they were based on the same conduct and plaintiff failed to allege that defendant "acted with a conduct committed with a more culpable state of mind than the negligence required for malpractice") (internal quotation marks omitted); *Melody Farms, Inc. v. Carson Fischer, PLC*, No. 215883, 2001 WL 740575, at *5 (Mich. Ct. App. Feb. 16, 2001) (holding that a claim for breach of fiduciary duty is redundant with a claim for legal malpractice).

47

reasonable for Plaintiffs to "repose confidence and trust" in Defendant WNJ, attorney for the Company and the ESOP, in 2017 and 2018. *See Prentis Family Found.*, 266 Mich. App. at 44 (recognizing that "the placement of trust, confidence, and reliance must be reasonable, and placement is unreasonable if the interests of the client and nonclient are adverse or even potentially adverse"). As WNJ argues, Plaintiffs fail to identify any fiduciary duty that WNJ owed them in 2017 or after. WNJ's alleged knowledge of Adcock's intended actions with regarding the Warrants in 2018 necessarily would have arisen out of a confidential attorney-client relationship between the Company and WNJ, and this attorney-client relationship prohibited WNJ from divulging facts learned during the course of that representation of the Company in 2017-2018 to Plaintiffs, or others.

Further, the prepayments on the Promissory Notes in 2017 did not change the nature of the transaction. Plaintiffs' Warrants were still valid when Plaintiffs were paid on their Promissory Notes, and presumably would have been honored if timely submitted (as Angelo Jr.'s was). There has been no argument that the 60-day term in the Warrants is inherently unreasonable. Thus, WNJ did not breach any fiduciary duty in drafting the ESOP documents, and Plaintiffs' claimed damages are a result of their failure to read and understand the documents, not anything done, or not done, by WNJ.

Accordingly, Plaintiffs' breach of fiduciary duty claim is dismissed for this reason as well.

### E. Whether Plaintiffs' Fraud Claims (Counts III and IV) are Barred by *Res Judicata* or Collateral Estoppel

WNJ argues that Plaintiffs' fraud claims in Counts III and IV of their Amended Complaint are barred by the doctrines of res judicata and/or collateral estoppel. (ECF No. 88, Def.'s Mot., PageID.1901-03.) WNJ contends that prior courts have found that the Family Members were not defrauded by the ESOP transaction, and that this determination should apply to "the ESOP's privies, including WNJ/Stemple." (*Id.*)

In deciding whether a state court judgment will be given preclusive effect in a federal court, the federal court looks to that state's res judicata and collateral estoppel laws. *Business Dev. Corp. of S.C. v. Rutter & Russin, LLC*, 37 F.4th 1123, 1129 (6th Cir. 2022). Under Michigan law, "res judicata is employed to prevent multiple suits litigating the same cause of action." *Foster v. Foster*, 509 Mich. 109, 120 (2022) (citation omitted). Res judicata (or claim preclusion) bars a subsequent action where "(1) the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could

49

have been, resolved in the first." *Mecosta Cnty. Med. Ctr. v. Metropolitan Group Prop. & Cas. Ins. Co.*, 509 Mich. 276, 282 (2022) (citation omitted).

Collateral estoppel (or issue preclusion), on the other hand, prevents relitigating issues raised and decided in a prior suit. *See id.* at 282-83 (citation omitted). Collateral estoppel applies where (1) "a question of fact essential to the judgment [was] actually litigated and determined by a valid and final judgment," (2) "the parties or privies '[had] a full [and fair] opportunity to litigate the issue'" in the original suit, and (3) "there [is] mutuality of estoppel." *Id.* at 283 (citation omitted). "Thus, both res judicata and collateral estoppel apply only when the parties in the subsequent action were parties or privies of parties to the original action." *Id.*

WNJ argues that prior state and federal courts have already decided that the Warrants are "unequivocal" and "unambiguous" and that it was Plaintiffs' failure to follow the plain language in the documents, not Adcock's alleged fraudulent conduct, that caused them not to exercise their Warrants on time. (ECF No. 88, Def.'s Mot., PageID.1902-03, citing *Iafrate v. Adcock*, 2022 WL 259245, at *8.) The Michigan Court of Appeals stated that "the prepayments on the Promissory Notes did not change the nature of the transaction as plaintiffs argue; rather, plaintiffs simply did not understand their own contracts." *Iafrate v. Adcock*, 2022 WL 259245

at *10. WNJ asserts that Plaintiffs here are collaterally estopped from asking this Court to disregard this determination.

Plaintiffs argue in Response that neither res judicata nor collateral estoppel apply here because this case involves a different issue than that litigated before. (ECF No. 89, Pls.' Resp., PageID.4413-16.) Plaintiffs contend that in the prior securities litigation in both the Federal and State courts, the Plaintiffs sought to establish that the ESOP transactional documents, as written and considered as a whole, required that the Warrants be honored by Adcock when submitted by Plaintiffs, and that the prior courts held that the documents were unambiguous and the Warrants were enforced according to their terms. But, Plaintiffs assert, this case seeks recovery for WNJ's failure to prepare those documents properly and in accordance with Plaintiffs' intentions and best interests.

WNJ generally seeks to apply collateral estoppel to Plaintiffs' "fraud" claims. Plaintiffs assert claims for fraudulent misrepresentation (Count III) and fraudulent concealment (Count IV). In those claims, Plaintiffs complain that WNJ failed to draft documents in conformity with the representations made to Plaintiffs and failed to advise Plaintiffs of the consequences of those documents as drafted. (ECF No. 77, Compl. ¶¶ 77.j.) Plaintiffs further complain that WNJ engaged in fraudulent misrepresentation or concealment in 2017-2018 when it "concealed from Plaintiffs

51

their newly-realized intent in 2017-2018 to assist Angelo Iafrate, Inc. and the ESOP

entity executives from providing full payment" for the Warrants. (*Id.* ¶¶ 79, 90.)

The Court finds that res judicata and collateral estoppel do not apply here as

to Plaintiffs' fraudulent misrepresentation and fraudulent concealment claims

against Defendant WNJ. Issues regarding Plaintiffs' legal relationship with WNJ,

and whether WNJ drafted the ESOP documents in conformity with representations

made to Plaintiffs in 2013 or whether WNJ conspired to assist AII with avoiding

payment of the Warrants to Plaintiffs, were not at issue in the prior litigation between

Plaintiffs and Adcock/AII. Plaintiffs do not appear to be trying to relitigate the plain

language in the Warrants in this case. *Compare Reme v. Jaques*, No. 192257, 1997

WL 33344955, at *5-6 (Mich. Ct. App. Sept. 2, 1997) (holding that collateral

estoppel does not apply to bar plaintiffs' claims "because the issues to be decided in

this case [Oklahoma's rules relative to conflict of laws and *forum non conveniens*]

are not the same as the issues actually and necessarily decided by the Delaware

Supreme Court"); *with Alterman v. Provizer, Eisenberg, Lichtenstein & Pearlman,*

*P.C.*, 195 Mich. App. 422, 426 (1992) ("There is no question that the acts allegedly

constituting negligence, i.e., allowing or causing plaintiff to settle while he was not

mentally competent, are identical to the issue decided in the federal case, i.e.,

whether plaintiff was competent at the time he signed the settlement agreement,"

and that "plaintiff is collaterally estopped from relitigating the issue, even though the parties are not identical, no mutuality exists, and no traditional exceptions apply.").

However, this Court does similarly find, as the prior Federal and State courts did, that the language in the Warrants is unambiguous, and that Plaintiffs could have read the plain and unambiguous language of their Warrants, but did not, and that those issues has been conclusively established.

### F. Whether Plaintiffs Can Prove Fraud Against WNJ (Counts III and IV)

Plaintiffs assert claims of fraudulent misrepresentation and fraudulent concealment against WNJ. (ECF No. 77, Compl. Counts III and IV.) Plaintiffs allege in support of their fraudulent misrepresentation claim that:

> Defendants failed to adequately inform the Plaintiffs that the description of the ESOP plan and implementation that had been described to them, in writing, and in financial projections, and which formed the basis of the decision to proceed with the ESOP transaction, had not been properly and completely replicated in the Closing documents and, further, that the failure to draft conforming documents threatened the ability of the individual Plaintiffs to recover the financial remuneration that had been projected and described as part of the "marketing" and sales effort in which Warner Norcross & Judd participated as the originator.

(*Id.* ¶ 77.j.) Plaintiffs further allege, with respect to their fraudulent concealment claim, that:

Defendants actively and fraudulent concealed from the Plaintiffs their newly-realized intent in 2017-2018 to assist Angelo Iafrate, Inc. and the ESOP entity executives from providing full payment of the obligations of Angelo Iafrate, Inc. and the ESOP entity as required by the Senior Promissory Notes, the Junior Promissory Notes, and the Warrants.

\*\*\*

Defendants actively concealed their role in preparing for this adverse contractual interpretation of the documents drafted by Warner Norcross & Judd, which the Defendants have fostered, encouraged, and supported by participating as litigation counsel for the Angelo Iafrate, Inc. entity and the ESOP entity.

\*\*\*

Defendants fraudulently concealed the direct conflict of interest they engaged in by representing the Angelo Iafrate, Inc. entity and the ESOP entity to the detriment of Plaintiffs.

(*Id.* ¶¶ 90, 92, 94.)

In Michigan, fraudulent misrepresentation consists of the following elements:

(1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, it knew that it was false, or made the representation recklessly, without any knowledge of its truth, and as a positive assertion; (4) the defendant made the representation with the intention that it should be acted on by the plaintiff; (5) the plaintiff acted in reliance on the representation; and (6) the plaintiff suffered injury due to his reliance on the representation.

*MacDonald v. Thomas M. Cooley Law Sch.*, 724 F.3d 654, 662 (6th Cir. 2013)

(quoting *Hord v. Envtl. Research Inst. of Mich.,* 463 Mich. 399, 617 N.W.2d 543,

546 (2000) (per curiam)). An action for fraudulent misrepresentation must be

predicted on a statement relating to a past or existing fact; future promises are not actionable. *Eerdmans v. Maki*, 226 Mich. App. 360, 366 (1997). A party must state "with particularity" the circumstances constituting the fraud. Fed. R. Civ. P. 9(b); *see also Bennett v. MIS Corp.*, 607 F.3d 1076, 1100 (6th Cir. 2010). That means that the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Indiana State Dist. Council of Laborers and Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 942-43 (6th Cir. 2009) (quotation marks and citation omitted).

Fraudulent concealment, or silent fraud, is based on the failure to reveal certain information and may be proven by showing "the failure to divulge a fact or facts the defendant had a [good faith] duty to disclose." *Fassihi*, 107 Mich. App. at 517. However, silence or failure to reveal relevant information cannot constitute actionable fraud unless it occurred under circumstances where the individual had a legal duty of disclosure. *U.S. Fidelity & Guar. Co. v. Black*, 412 Mich. 99, 125 (1981); *Prentis Family Found.*, 266 Mich. App. at 48 ("Mere silence is insufficient" for a fraudulent concealment claim) (citation omitted). Further, "[a] plaintiff cannot merely prove that the defendant failed to disclose something; instead, 'a plaintiff must show some type of representation by words or actions that was false or

55

misleading and was intended to deceive.'" *Lucas v. Awaad*, 299 Mich. App. 345, 363-64 (2013) (citation omitted).

In addition, under Michigan law, to establish a fraud claim, the plaintiff's reliance on the misrepresentation must be "reasonable." *McCallum v. Pixley* (*In re Pixley*), 456 B.R. 770, 781 (Bankr. E.D. Mich. 2011) (stating that "in *Cooper v. Auto Club Ins. Ass'n*, 481 Mich. 399, 751 N.W.2d 443, 451–52 (2008), the Michigan Supreme Court held that 'reasonable' reliance is a necessary element of fraud"). There can be no fraud when a person has the means to determine a representation is not true. *Nieves v. Bell Indus., Inc.*, 204 Mich. App. 459, 464 (1994); *see also MacDonald v. Thomas M. Cooley Law Sch.,* 880 F. Supp. 2d 785, 795 (W.D. Mich. 2012) ("Unreasonable reliance includes relying on an alleged misrepresentation that is expressly contradicted in a written contract that the plaintiff reviewed and signed."), *aff'd*, 724 F.3d 654 (6th Cir. 2013).

WNJ argues that, viewed in the light most favorable to Plaintiffs, there are no genuine issues of material fact to support their fraud claims. WNJ asserts that Plaintiffs "had the ability to read, review, revise and comment on any and all of the transactional documents before the transaction closed [on December 6, 2013] and had the documents in their possession for years before they exercised their Warrants [in 2018]." (ECF No. 88, Def.'s Mot., PageID.1906-07.) WNJ argues that there is

56

no evidence, much less clear and convincing proof, of any fraud perpetrated upon Plaintiffs by WNJ/Stemple, with whom Plaintiffs admittedly never communicated, either before or after the ESOP transaction closed. (*Id.*)

Plaintiffs argue in Response brief that WNJ had an "affirmative obligation" to "disclose the conflicts and the interpretation of the Warrants that were detrimental to Plaintiffs' interests." (ECF No. 89, Pls.' Resp., PageID.4425.) Plaintiffs contend that, at a minimum, WNJ "owed Plaintiffs duties as former clients" and that "[WNJ] committed fraudulent concealment when Stemple knew of Adcock's intentions, and even counseled Adcock as he conspired against Plaintiffs' interests creating questions of fact for the jury." (*Id.*)

Plaintiffs admit that they were aware that WNJ represented both Plaintiffs and the Company in 2013 during the formation of the ESOP and during the drafting of the ESOP documents, including the Warrants. That Plaintiffs allegedly were not told in 2013 that WNJ's representation of both the Company and Plaintiffs in the ESOP transaction could constitute a conflict, or could materially affect its representation of Plaintiffs, "may constitute legal malpractice [which claim would be time-barred], but it does not constitute fraud." *Sports Mgmt. Network v. Busch*, No. 17-10413, 2019 WL 1057314, at *9 (E.D. Mich. Mar. 6, 2019) (noting that Busch knew that

the law firm defendants also represented several of the racing teams for which he drove).

As to the Warrants, it is undisputed that Plaintiffs were provided with the Warrants in their final form in November 2013 and that they executed the Warrants in December 2013. Plaintiffs are presumed to have read and understood the documents they signed. *See McKinstry*, 428 Mich. at 184 ("Michigan law further presumes that one who signs a written agreement knows the nature of the instrument so executed and understands its contents.") (citations omitted). "The purpose of this rule is well recognized – to preserve the integrity and stability of written instruments." *Id.* It is well-settled that the failure to read a contract is not a defense to enforcement of the contract's terms. *Watts v. Polaczyk*, 242 Mich. App. 600, 604 (2000); *see also Rowady v. K Mart Corp.*, 170 Mich. App. 54, 60 (1988) ("[A] person cannot avoid a written contract on the ground that he did not attend to its terms, did not read it, supposed it was different in its terms, or that he believed it to be a matter of mere form."). Likewise, "[w]here one writing references another instrument for additional contract terms" so that "the two writings should be read together," *Forge v. Smith,* 458 Mich. 198, 207 (1998), Michigan law presumes that a party who signs that written agreement understands the nature of any documents which that agreement references. *See Heathscott v. NBD Bank*, No. 206575, 1999 WL

58

33441302, at *4 (Mich. Ct. App. June 8, 1999) (holding that a party's failure to "obtain an explanation of a contract is ordinary negligence ... [that] estops the party from avoiding the contract on the ground that the party was ignorant of the contract provisions").

Plaintiffs have had the ability to read and review the Warrants, and all the ESOP transactional documents, since at least December 2013. Plaintiffs have not presented any evidence that they questioned WNJ about the Warrants, or any other ESOP documents, after the closing of the ESOP transaction. Further, following the closing, and at the time the Notes were paid, Plaintiffs could have sought advice from Stefani, whom they still considered to be the family attorney. The Warrants have been found by both state and federal courts to be unambiguous and to plainly require the "Holder" to exercise the Warrant within 60 days of the final payment of *the Holder's* Senior and Junior Promissory Notes. Those Courts found that the Company, in declining those Warrants, did not act fraudulently. There is no evidence that WNJ fraudulently misrepresented or concealed the language in the Warrants, and there can be no fraud when a person has the means to determine a representation is not true. *Nieves*, 204 Mich. App. at 464.

As explained *supra*, Plaintiffs have not offered any evidence that Plaintiffs had an attorney-client relationship with WNJ in 2017 and 2018 (when the Notes

were paid and the Warrant's declined), and thus no evidence of any conflict of interest at that time. Plaintiffs have presented no evidence that they communicated with WNJ since the December 2013 closing of the ESOP, and the evidence shows that Adcock, on behalf of AICC and acting in his fiduciary status as ESOP Trustee, not WNJ, made the decision to enforce the Warrants in accordance with their plain language.

Based on all the above, the Court finds that Plaintiffs' fraudulent misrepresentation and fraudulent concealment claims fail as a matter of law and therefore are dismissed.

## IV.  CONCLUSION

For the reasons set forth above, the Court GRANTS Defendant Warner, Norcross & Judd, LLP's Motion for Summary Judgment (ECF No. 88), and Plaintiff's claims are DISMISSED WITH PREJUDICE.


IT IS SO ORDERED.

s/Paul D. Borman
Paul D. Borman
United States District Judge

Dated: June 23, 2023

60